**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| KIMBERLY DOMINGUEZ, and BRADLEY LEJA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOODLEAP, LLC,<br><br>Defendant. | Civil Action No.: 1:26-cv-1479<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

## I. INTRODUCTION

1. This is a proposed class action challenging the deceptive, unlawful solar-financing practices aimed at active military members—like Plaintiffs Kimberly Dominguez, who was an active-duty Sergeant in the U.S. Army Reserve ("Sgt. Dominguez") at the time of her loan, and Plaintiff Bradley Leja, who was an active-duty Master Sergeant in the U.S. Army ("MSgt. Leja") at the time of his loan—by Defendant, GoodLeap LLC ("GoodLeap"). Through its nationwide residential solar lending program, GoodLeap facilitated and profited from loans that concealed substantial financing costs, misrepresented the true nature of loan obligations, and charged interest on amounts beyond what is allowed under the contract.

2. In recent years, the residential solar industry has experienced dramatic growth throughout the United States. That expansion has been fueled largely by financing programs offered through partnerships between solar installers and specialized lenders like GoodLeap. Rather than consumers independently seeking financing, solar loans are arranged during high-

pressure in-home or door-to-door sales presentations in which the installer simultaneously markets both the solar system and the financing product. Federal regulators have warned that this business model creates substantial risks of deception and consumer harm because consumers are often induced into complex financing agreements without understanding the true cost of the transaction.

3. The Consumer Financial Protection Bureau ("CFPB") has warned that solar-financing arrangements involving nonbank lenders and solar sales organizations have generated widespread complaints from homeowners who were misled about loan terms, projected savings, and the actual cost of solar energy systems. According to the CFPB, many consumers report being steered into loans with inflated balances, unexpectedly high monthly obligations, and promised energy savings that never materialize.

4. GoodLeap was, and remains, one of the dominant lenders operating within the residential solar-financing market. Through its partnerships with solar sales organizations and installers, GoodLeap systematically participated in and benefited from the deceptive and unfair practices described herein, namely, the inclusion of undisclosed dealer fees in loan principals, the promotion of misleading tax-credit assumptions, and the origination of loans containing payment structures harmful to consumers.

5. These practices are particularly harmful to active-duty servicemembers and their dependents, who are entitled to heightened protections under the Military Lending Act ("MLA"), 10 U.S.C. § 987, and its implementing regulations. Congress enacted the MLA to protect servicemembers from predatory lending practices, prohibit creditors from imposing unlawful loan terms, ensure fulsome disclosure of credit costs charges, and curb abusive lending practices affecting military families. GoodLeap nevertheless extended consumer credit to covered borrowers in violation of the MLA.

## II. PARTIES, JURISDICTION, AND VENUE

6. Plaintiff Kimberly Dominguez is a citizen of Hampton, Virginia, who financed a solar energy system through GoodLeap. Sgt. Dominguez was an active-duty servicemember in the U.S. Army Reserve at the time she became obligated on her GoodLeap loan. Sgt. Dominguez served on active duty in the U.S. Army Reserve for almost ten years, from September 30, 2013, until May 24, 2023.

7. Plaintiff Bradley Leja is a citizen of Stafford, Virginia, who financed a solar energy system through GoodLeap. MSgt. Leja was an active-duty servicemember in the U.S. Army at the time he became obligated on his GoodLeap loan. MSgt. Leja served on active duty in the U.S. Army for more than two decades, from February 2004 until January 31, 2026.

8. Defendant GoodLeap is a California limited liability company whose sole member is Paramount GR Holdings LLC. Hayden Dickinson ("Hayes") Barnard—the founder, chairman, and CEO of GoodLeap—is the sole member of Paramount GR Holdings LLC. Upon information and belief, Hayes Barnard is a citizen of Texas, making GoodLeap a citizen of Texas.

9. This Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff's Complaint alleges two federal claims under the MLA and TILA. Under the MLA, "[a]n action for civil liability . . . may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction." 10 U.S.C. § 987. Under the TILA, "any action … may be brought in any United States district court, or in any other court of competent jurisdiction." 15 U.S.C. § 1640(e).

10. This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in this State and District, including its lending practices that give rise to this action.

11. Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here.

## III. FACTUAL BACKGROUND

### The Rise of Residential Solar Industry

12. Residential solar systems are typically marketed and installed through networks of solar installers and financing partners operating throughout the United States. These companies market solar energy systems as a means for homeowners to reduce or eliminate traditional electricity costs while taking advantage of government-sponsored incentives and tax benefits.

13. Increased advertising emphasizing rising utility prices, environmental benefits, and federal tax incentives has contributed to a substantial increase in consumer demand for residential rooftop solar systems. The rapid expansion of the industry has, in turn, generated a corresponding increase in solar financing products marketed directly to consumers.

14. According to publicly available industry and government data, residential solar installations in the United States have grown dramatically over the past two decades, with cumulative residential solar capacity increasing several-fold nationwide. The industry has likewise experienced extraordinary revenue growth during that same period, attracting a large number of new market participants seeking to capitalize on the expanding demand for residential solar systems.

15. The rapid growth of the residential solar market has resulted in the entry of numerous inexperienced and loosely regulated installation companies. Many of these entities rely heavily on aggressive sales tactics designed to maximize sales volume rather than ensure consumers fully understand the long-term financial obligations associated with solar-system purchases and financing agreements.

16. Residential solar systems are frequently sold through door-to-door solicitations and in-home sales presentations. During these presentations, sales representatives commonly market both the solar system and the associated financing product simultaneously, creating the impression that the transaction involves little or no financial risk to the homeowner.

17. Solar sales representatives are routinely trained to persuade homeowners that they can obtain a solar energy system with "no money down" or "zero out-of-pocket costs," while replacing their existing utility bill with a stable and predictable monthly solar payment. Consumers are further told that federal tax incentives and anticipated utility savings will substantially offset—or even eliminate—the effective cost of the solar energy system over time.

18. Through standardized sales scripts, marketing materials, and financing presentations, solar installation companies and their lending partners create the impression that homeowners will obtain a solar energy system without any upfront payments; finance the cost of the system through affordable long-term monthly payments; receive substantial government assistance that will reduce the cost of the system; replace or eliminate their electricity bills; and ultimately obtain "free power" once the financing obligation is satisfied.

19. In practice, however, many homeowners discover that the promised savings fail to materialize, that utility bills continue alongside solar loan payments, and that the total financed amount substantially exceeds the actual cash price of the solar energy system due to hidden dealer fees and financing charges embedded within the loan principal.

20. Most residential solar energy systems are financed through long-term consumer loans, frequently extending twenty to twenty-five years. These loans often carry substantial finance charges and payment structures that are minimally explained to consumers during the sales process. As a result, consumers—including active-duty servicemembers and their dependents—

are induced into costly financing arrangements without the benefit of detailed disclosures reflecting the true nature or total cost of the transaction.

**GoodLeap's Solar Lending Model**

21. GoodLeap markets itself as a financial technology ("fintech") company that originates and services consumer loans through digital platforms, including web-based portals and mobile applications. GoodLeap has become a dominant lender in the residential solar industry by partnering directly with solar sales organizations and installation companies to provide integrated financing at the point of sale.

22. Under GoodLeap's business model, solar installers are encouraged or required to incorporate GoodLeap financing into their sales presentations and proposals to homeowners. Rather than consumers independently shopping for financing, the financing product is presented simultaneously with the solar energy system as part of a single transaction.

23. GoodLeap's mobile lending platform allows sales representatives to access loan products instantly through a mobile device (typically a tablet or smartphone) while physically present in consumers' homes. Using these digital tools, sales representatives can generate loan applications, obtain rapid credit decisions, and present pre-structured financing terms during the sales presentation itself. The solar energy system salesperson is effectively able to bind a homeowner to long-term financing contracts with GoodLeap without the homeowner ever speaking with GoodLeap directly.

24. The integration of GoodLeap financing into in-home sales presentations creates the appearance that the financing arrangement is merely a convenient mechanism for paying the stated price of the solar system and related installation services. Consumers are led to believe that the "amount financed" identified in the loan documents reflects the true cash price of the solar project.

25. A central feature of GoodLeap's lending model is the promotion of purportedly low-interest financing, often marketed as carrying interest rates substantially below prevailing market rates for unsecured consumer lending. Sales representatives emphasize the low stated annual percentage rate ("APR") and affordable monthly payments as a key inducement for consumers to enter into the transaction.

26. In reality, however, GoodLeap's loan products include substantial undisclosed charges commonly referred to by GoodLeap as "dealer fees" or "program fees."[1] These fees are embedded directly into the loan principal and financed over the life of the loan without being separately and clearly disclosed to consumers as finance charges.

27. The dealer fee is not used to purchase or install solar equipment, nor does it provide additional value to the homeowner. Instead, the fee is retained by GoodLeap as an undisclosed finance charge.

28. These dealer fees frequently amount to tens of thousands of dollars and dramatically increase the total amount financed above the actual cash price of the solar system and installation services. By embedding the fee within the principal balance instead of disclosing it as a finance charge, GoodLeap deceives consumers into believing they are receiving below-market financing, while concealing the true cost of credit.

29. GoodLeap further profits by charging interest over the life of the loan on the inflated principal balance that includes the undisclosed dealer fee. As a result, consumers pay interest not only on the actual cost of the solar system and installation services, but also on hidden financing charges embedded within the loan amount itself.

[1] This Complaint refers to these fees as "dealer fees."

30. This practice is particularly deceptive because GoodLeap's standardized loan agreements represent that interest will accrue only on amounts "actually disbursed." GoodLeap, however, does not disburse the dealer fee to the installation company as payment for goods or services provided to the consumer. Instead, GoodLeap retains all of the dealer fee for its own benefit and profit. Accordingly, despite representing that interest would be charged only on amounts actually disbursed, GoodLeap charges consumers interest on sums that were never truly disbursed for the consumer's benefit or used to purchase the solar system or related services.

31. The inclusion of dealer fees within the stated amount financed is a standardized and systematic feature of GoodLeap's solar lending program and was implemented uniformly across all of GoodLeap-originated residential solar loans, including loans issued to covered borrowers protected under the Military Lending Act.

32. GoodLeap's solar loans also feature monthly payments that begin at an artificially reduced level before increasing dramatically after between twelve and eighteen months.

33. The low introductory monthly payments promoted during the sales process are typically based on the assumption that the homeowner will make a substantial lump-sum prepayment within approximately 12 to 18 months after loan origination, thereby reducing the principal owed and ameliorating the effect of the scheduled hike in monthly payments. Sales representatives commonly represent that this payment will come from anticipated federal solar tax incentives.

34. In reality, however, the purported "tax rebate" touted during the sales presentation does not exist. Rather, the potential federal solar tax benefit is a nonrefundable tax credit subject to numerous eligibility requirements and limitations, including the consumer's individual tax liability and financial circumstances. Many homeowners either do not qualify for the full

anticipated credit and do not receive funds sufficient to make the required lump-sum payment. When the homeowner fails to make the expected prepayment, the loan is re-amortized and the monthly payment increases substantially. The contingent and ballooning nature of these payment obligations is frequently minimized, obfuscated, or hidden completely during the sales process.

35. Upon information and belief, GoodLeap's agreements, policies, and training materials instruct or encourage participating solar installers and sales representatives not to disclose the existence or amount of the embedded dealer fee to consumers. GoodLeap and its sales partners further avoid disclosing the true cash price of the solar system and installation services because disclosure of the actual cash price would reveal that the loan principal includes substantial hidden financing charges unrelated to the value of the goods and services provided to the homeowner.

36. Bolstering this deception, GoodLeap instructs and trains their partners to emphasize the monthly installment payment instead of the total cost of the loan so that consumers believe they are obtaining far greater cost savings than they are.

37. Defendant's lending arrangements that include the undisclosed dealer fee are crucial to its partners' sales practices, funding nearly all sales each partner generates. Defendant's partners purposefully use (and used) the financing offered by Defendant as the primary means of obtaining new customers by comparing what on paper appears to be a low monthly payment with the customers' monthly electricity bill.

38. But as explained herein, the financing arrangements deployed by Defendant and its partners shroud the true cost of the solar panel systems, which are in fact much lower than the advertised loan principal.

39. As residential solar panels are a niche and nascent market, consumers are unaware that they are paying thousands of dollars more for the solar panels funded by Defendant than the systems are worth. Defendant and its partners exploit this fact by building the dealer fee into the total loan balance while representing in the loan agreements themselves that the entire balance pays for the consumer's solar panel system, when in fact it does not.

**Kimberly Dominguez**

40. Sgt. Dominguez was an active-duty servicemember and a "covered borrower" within the meaning of the Military Lending Act and its implementing regulations at the time she became obligated on her GoodLeap loan.

41. On or about May 2, 2022, Sgt. Dominguez was solicited at her home by a sales representative associated with Titan Solar Power ("Titan") concerning the purchase and installation of a residential solar energy system.

42. During the sales presentation, the sales representative represented that the solar system would effectively eliminate Sgt. Dominguez's existing utility bills and replace them with a lower, predictable solar payment. The sales representative further represented that the federal government would provide substantial tax incentives that would significantly offset—or effectively pay for—the cost of the system.

43. The sales representative further represented that the solar system and installation costs would be financed through GoodLeap at an exceptionally low interest rate, including rates as low as 1.99%. The salesperson emphasized that these rates were substantially below prevailing market rates for comparable consumer loans and presented GoodLeap financing as the only financing option available for the transaction.

44. During the sales presentation, Sgt. Dominguez was directed to provide electronic signatures on a tablet device controlled by the salesperson. Those electronic signatures were used to bind Sgt. Dominguez to a 25-year consumer loan agreement with GoodLeap. Prior to signing, Sgt. Dominguez did not speak with any other representative from GoodLeap regarding the loan terms, financing structure, or total cost of credit.

45. Sgt. Dominguez was not provided a meaningful opportunity to review the written loan agreement before being asked to sign electronically.

46. Sgt. Dominguez was not provided a copy of the loan agreement or related financing disclosures prior to execution of the transaction.

47. According to the loan agreement attached hereto as Exhibit A, Sgt. Dominguez purportedly financed $27,352.30 through a 25-year loan with a stated annual percentage rate ("APR") of 1.99%, to be repaid through monthly installment payments over the life of the loan:

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 1.99% | $7,553.20 (e) | $27,352.30 | $34,905.50 (e) |

48. The only finance charge disclosed on the face of the loan agreement was the interest calculated over the stated amount financed during the loan term.

49. The loan agreement further represented that the full financed amount of $27,352.30 would be disbursed to Titan for the purchase and installation of the solar system:

| Itemization of Amount Financed | |
|---|---|
| Itemization of the amount financed: | $27,352.30 |
| Amount given to you directly: | $0 |
| Amount paid to others on your behalf: | $27,352.30 to Titan Solar Power |

50. The loan agreement additionally stated that "interest will accrue on the loan amounts actually disbursed."

51. In reality, upon information and belief, GoodLeap did not disburse the full $27,352.30 to Titan for goods and installation services. Instead, GoodLeap retained for itself a substantial undisclosed dealer fee that materially increased the amount financed above the actual cash price of the solar project. Upon information and belief, the undisclosed dealer fee amounted to approximately 30% of the true cost of the goods and services financed through the transaction.

52. As a result of the undisclosed fee, the actual APR of Sgt. Dominguez's loan was dramatically higher than the 1.99% that GoodLeap disclosed.

53. Sgt. Dominguez had no knowledge of the existence of the dealer fee at the time of the transaction and was not provided any information that would have caused a reasonably diligent consumer to discover that a substantial portion of the loan principal did not relate to the purchase or installation of the solar system.

54. The loan agreement included an initial payment schedule requiring monthly payments of approximately $86.95. The loan was structured to re-amortize after the eighteenth month unless Sgt. Dominguez made a substantial lump-sum "voluntary prepayment" equal to approximately 26% of the loan balance, purportedly corresponding to the anticipated federal tax credit.

55. Sgt. Dominguez did not receive the governmental tax benefits represented during the sales presentation and was unable to make the required lump-sum prepayment. As a result, her monthly loan payments increased substantially after the expiration of the introductory payment period. The re-amortization structure and resulting payment increase were not disclosed or explained during the sales process.

56. According to permitting and installation records associated with the project, the financed solar energy system consisted of approximately:

a. fourteen (14) Q Cells Q.PEAK DUO BLK ML-G10+ 400W solar panels;

b. one (1) SolarEdge SE5000H-USRGM inverter;

c. fourteen (14) SolarEdge P401 optimizers;

d. K2 racking, rails, and attachment hardware; and

e. related electrical components, including disconnects, conduit, wiring, grounding equipment, and junction boxes.

57. Upon information and belief, the estimated fair-market cost of the equipment associated with the solar installation was substantially less than the amount financed and was approximately $8,500 at the time of installation in 2022.

58. Upon information and belief, the remaining balance of the financed amount was allocated toward installation labor, profit to Titan, and GoodLeap's undisclosed dealer fee.

59. Had the true financing terms, dealer fee, total cost of credit, and payment structure been accurately disclosed and explained, Sgt. Dominguez would not have entered into the transaction or financed the solar system through GoodLeap.

**Sgt. Dominguez's Installed Solar Energy System**

60. The solar energy system was installed at, and connected to, Sgt. Dominguez's property in 2022.

61. The system was engineered and permitted specifically for Sgt. Dominguez's residence, and a structural evaluation was performed by a Virginia-licensed professional engineer addressing this specific roof structure.

62. The solar array is not free-standing or merely resting on the roof; it is mechanically fastened into the home's structural roof framing. The modules are secured to K2 CrossRail 48-X aluminum rails, which are in turn anchored to the roof through "Splice Foot X" mounting feet.

63. The mounting feet are fastened to the home's structural roof members—prefabricated 2x4 wood trusses spaced 24 inches on center—using 5/16-inch diameter lag screws driven into the framing with a minimum 2 ½” embedment.

64. The array is anchored to the roof at 63 separate attachment points, distributed and staggered across adjacent framing members.

65. Removal of the array would require unbolting and detaching 63 separate anchor points fastened into the structural framing and would leave 126 lag-screw penetrations through the roofing and deck, necessitating repair of the roof to restore its weatherproof condition.

66. The array does not function as a stand-alone appliance; it is hard-wired into and made a permanent part of the residence’s electrical system. DC conductors run from the rooftop array through a new junction box and into the SolarEdge inverter, which converts the power for household use.

67. From the inverter, the system is wired through a fused AC disconnect and connected directly into the residence’s existing main service panel (the home's primary electrical distribution panel).

68. The system is permanently routed through fixed conduit and connected through the home’s existing main electrical service equipment, integrating the array into the same electrical system that powers the residence.

69. The system is designed as a grid-interactive (utility-interactive) system that is interconnected with the electric utility through the residence’s existing electrical service equipment.

70. The system is tied to the utility, Dominion Energy, and operates through a bi-directional utility meter installed at the property, which measures power flowing both to and from the residence.

71. As these facts demonstrate, the solar panel array was designed to be—and indeed is—permanently attached to Sgt. Dominguez's residence.

**Bradley Leja**

72. MSgt. Leja was an active-duty servicemember and a "covered borrower" within the meaning of the Military Lending Act and its implementing regulations at the time he became obligated on his GoodLeap loan.

73. MSgt. Leja was solicited via email and telephone by a sales representative associated with Green Brilliance concerning the purchase and installation of a residential solar energy system.

74. During the sales presentation, the sales representative represented that the solar system would effectively eliminate MSgt. Leja's existing utility bills, and that his system would produce energy beyond what his home needed, which his utility provider would sell, entitling MSgt. Leja to credits from his utility provider.

75. The sales representative further represented that the federal government would provide substantial tax incentives that would significantly offset—or effectively pay for—the cost of the system. The tax incentive MSgt. Leja actually received was dramatically less than advertised.

76. The sales representative further represented that the solar system and installation costs would be financed through GoodLeap at an exceptionally low interest rate, including rates

as low as 1.99%. The salesperson presented GoodLeap financing as the only financing option available for the transaction.

77. During the sales presentation, MSgt. Leja was directed to provide electronic signatures to execute his loan agreement with GoodLeap. Those electronic signatures were used to bind MSgt. Leja to a 25-year consumer loan agreement with GoodLeap. Prior to signing, MSgt. Leja did not speak with any other representative from GoodLeap regarding the loan terms, financing structure, or total cost of credit.

78. MSgt. Leja was not provided a meaningful opportunity to review the written loan agreement before being asked to sign electronically.

79. MSgt. Leja was not provided a copy of the loan agreement or related financing disclosures prior to execution of the transaction.

80. According to the loan agreement attached hereto as Exhibit B, MSgt. Leja purportedly financed $54,746.00 through a 25-year loan with a stated annual percentage rate ("APR") of 1.99%, to be repaid through monthly installment payments over the life of the loan:

| **ANNUAL PERCENTAGE RATE** The cost of your credit as a yearly rate | **FINANCE CHARGE** The dollar amount the credit will cost you | **Amount Financed** The amount of credit provided to you or on your behalf | **Total of Payments** The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| **1.99%** | **$15,118.39 (e)** | **$54,746.00** | **$69,864.39 (e)** |

81. The only finance charge disclosed on the face of the loan agreement was the interest calculated over the stated amount financed during the loan term.

82. The loan agreement further represented that the full financed amount of $54,746.00 would be disbursed to Green Brilliance for the purchase and installation of the solar system:

| Itemization of Amount Financed | |
|---|---|
| **Itemization of the amount financed:** | $54,746.00 |
| Amount given to you directly: | $0 |
| Amount paid to others on your behalf: | $54,746.00 to Green Brilliance |

83. The loan agreement additionally stated that "interest will accrue on the loan amounts actually disbursed."

84. In reality, upon information and belief, GoodLeap did not disburse the full $54,746.00 to Green Brilliance for goods and installation services. Instead, GoodLeap retained for itself a substantial undisclosed dealer fee that materially increased the amount financed above the actual cash price of the solar project. Upon information and belief, the undisclosed dealer fee amounted to approximately 30% of the true cost of the goods and services financed through the transaction.

85. As a result of the undisclosed fee, the actual APR of MSgt. Leja's loan was dramatically higher than the 1.99% that GoodLeap disclosed.

86. MSgt. Leja had no knowledge of the existence of the dealer fee at the time of the transaction and was not provided any information that would have caused a reasonably diligent consumer to discover that a substantial portion of the loan principal did not relate to the purchase or installation of the solar system.

87. The loan agreement included an initial payment schedule requiring monthly payments of approximately $174.03. The loan was structured to re-amortize after the eighteenth month unless MSgt. Leja made a substantial lump-sum "voluntary prepayment" equal to approximately 26% of the loan balance, purportedly corresponding to the anticipated federal tax credit.

88. MSgt. Leja did not receive the governmental tax benefits represented during the sales presentation and was unable to make the required lump-sum prepayment. As a result, his monthly loan payments increased substantially after the expiration of the introductory payment

period. The re-amortization structure and resulting payment increase were not disclosed or explained during the sales process.

89. Upon information and belief, the fair-market cost of the equipment associated with the solar installation was substantially less than the amount financed at the time of installation in 2022.

90. Upon information and belief, the majority of the financed amount was allocated toward installation labor, profit to Green Brilliance, and GoodLeap's undisclosed dealer fee.

91. Had the true financing terms, dealer fee, total cost of credit, and payment structure been accurately disclosed and explained, MSgt. Leja would not have entered into the transaction or financed the solar system through GoodLeap.

**Bradley Leja's Installed Solar Energy System**

92. The solar energy system was installed at, and connected to, MSgt. Leja's property in 2022.

93. As with Sgt. Dominguez's system, MSgt. Leja's system was designed and engineered specifically for MSgt. Leja's residence, was mechanically fastened to his roof in a similar manner, and was hard-wired into and made a permanent part of the residence's electrical system.

94. MSgt. Leja's system is also a grid-interactive (utility-interactive) system that is interconnected with the electric utility through the residence's existing electrical service equipment.

95. As these facts demonstrate, the solar panel array was designed to be—and indeed is—permanently attached to MSgt. Leja's residence.

## IV. CLASS ACTION ALLEGATIONS

96. Sgt. Dominguez and MSgt. Leja bring this class action on behalf of themselves and all other persons similarly situated. The proposed "MLA Class" and "TILA Class" (collectively the "Classes") are defined as follows:

> **MLA Class**: All Covered Members[2] and dependents of Covered Members to who: (1) borrowed money from GoodLeap for the purchase of a solar energy system; and (2) where the stated amount of the loan included a fee not paid to the seller/installer.
>
> **TILA Class**: All Covered Members and dependents of Covered Members to who: (1) borrowed money from GoodLeap for the purchase of a solar energy system; (2) where the stated amount of the loan included a fee not paid to the seller/installer; and (3) where the amount disbursed to the seller/installer was less than the TILA cap under 15 U.S.C. § 1603(3), as adjusted annually.

97. Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) GoodLeap and any entity in which GoodLeap has a controlling interest, or which has a controlling interest in GoodLeap, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

98. Sgt. Dominguez and MSgt. Leja reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

99. Plaintiffs are unable to state the precise number of members of the classes because such information is in the exclusive control of GoodLeap. GoodLeap's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so

---

[2] A "Covered Member" is defined as "a member of the armed forces who is [] on active duty under a call or order that does not specify a period of 30 days or less[] or an active Guard and Reserve Duty." 10 U.S.C. § 987(i)(1).

numerous that joinder of all members is impracticable. GoodLeap has made at least hundreds of thousands of loans, and Sgt. Dominguez and MSgt. Leja estimate there are, at least several thousands of consumers in the MLA Class and TILA Class. As a result, Plaintiffs believe that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of GoodLeap.

100. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GoodLeap's possession, custody, or control.

**Predominance of Common Questions of Law and Fact**

101. Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between them. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the so-called "dealer fee" constitutes a "finance charge" under the MLA or TILA; (2) whether Defendant, in fact, failed to properly disclose the dealer fee to consumers; (3) whether such a failure constitutes a violation of the MLA or TILA; and (4) the amount of actual, statutory, and exemplary damages to award to the class members based on Defendant's intentional, frequent, and persistent conduct and the number of persons adversely affected.

**Typicality**

102. Sgt. Dominguez's and MSgt. Leja's claims are typical of the claims of each of the putative class members they seek to represent. Sgt. Dominguez and MSgt. Leja are also entitled to relief under the same causes of action as the other putative class members. All class claims are based on the same facts and legal theories.

**Adequate Representation**

103. Sgt. Dominguez and MSgt. Leja will fairly and adequately assert and protect the interests of the Classes. Sgt. Dominguez and MSgt. Leja have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will interfere with maintenance of this class action.

104. Plaintiffs and their counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Superiority**

105. Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be nearly impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if class members could afford it, individual litigation would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by GoodLeap's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

**COUNT ONE**
**(Violations of the Truth in Lending Act, 15 U.S.C. §§ 1638(a)(3), 1640)**
**(On Behalf of Plaintiffs and the TILA Class)**

106. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–105 above.

107. TILA's declared purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a); *see also Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 326 (6th Cir. 2001) ("TILA endeavors to enable consumers to evaluate credit offers separately from the purchase of merchandise, and thereby to create an active market providing more efficient credit prices."). In keeping with this purpose, TILA requires creditors—like GoodLeap—to disclose the "amount financed" as part of the consumer credit transaction. The amount financed is defined as "the amount of credit of which the consumer has actual use" and is calculated using the "cash price" of the system. 15 U.S.C. § 1638.

108. TILA also requires creditors to separately disclose any "finance charge" that they impose on consumers in a credit transaction. 15 U.S.C. § 1638(a)(3). A "finance charge" is defined by the Act as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a).

109. TILA's enacting regulation, Regulation Z, also defines "finance charge" to include any "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a).

110. A "finance charge" subject to TILA's disclosure requirements is any cost of the financing arrangement that would not be charged if the consumer paid for the same goods or services in cash.

111. Despite the obvious requirement that it disclose any added charges in connection with the solar financing agreements it offered to Plaintiffs and members of the putative classes, Defendant elected to conceal the "dealer fee" as part of the total loan principal, falsely representing that the total loan amount paid for the actual cost of the solar panel systems. GoodLeap did so to protect the millions in additional profits it stood to make from concealing the tens of thousands in fees it could collect per loan, as it knew consumers would not agree to pay such amounts unless they believed they were paying for the promised solar panel systems.

112. Defendant violated 15 U.S.C. § 1638 by failing to disclose to Plaintiffs' and the putative TILA Class members—as a finance charge—a hidden fee when they borrowed money to purchase a solar power system.

113. Upon information and belief, as a standard practice, Defendant intentionally concealed and failed to disclose hidden "dealer fees" that are baked into a loan's principal amount.

114. Upon information and belief, Defendants' conduct is a part of a broader practice of frequent and persistent noncompliance with § 1638.

115. The fee caused the Amount Financed, the Finance Charge, the APR, and the Itemization of Amount Financed in each of the class members' loan disclosures to be wrong.

116. Plaintiffs and the putative class members suffered actual damages because of Defendant's violations of § 1638.

117. Based on Defendant's noncompliance with § 1638, Plaintiffs seek, individually and on behalf of the TILA Class, actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1640(a).

**COUNT TWO**
**(Violations of the Military Lending Act 10 U.S.C. § 987)**
**(On Behalf of Plaintiffs and the MLA Class)**

118. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–105 above.

119. A "Covered Member" under the MLA is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

120. Sgt. Dominguez, MSgt. Leja, and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA.

121. GoodLeap is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

122. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); *see also* 10 U.S.C. § 987(i)(6).

123. The MLA sets out credit disclosure requirements that are even more robust than TILA's. As a baseline, the MLA requires creditors make "any disclosures required under the Truth in Lending Act." 10 U.S.C. § 987(c)(1)(B).

124. In addition, the MLA requires the lender provide—orally and in writing before the issuance of the credit—"a statement of the annual percentage rate of interest applicable to the extension of credit" and "a clear description of the payment obligations of the member or dependent, as applicable." 10 U.S.C. § 987(c).

125. The term "interest" has a special meaning under the MLA and "includes all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit." 10 U.S.C. § 987(i)(3). The MLA's implementing regulations clarify that the interest rate that must be disclosed is the military annual percentage rate, or "MAPR." 32 C.F.R. § 232.6(a)(1).[3]

126. Accordingly, Defendant was required under the MLA to disclose the annual percentage rate of interest applicable to Plaintiffs' GoodLeap loan agreements, including all finance charges and "cost elements associated with the extension of credit." GoodLeap failed to comply with this section insofar as it concealed the hefty dealer fee that it imposed as a cost element of the credit agreement.

127. GoodLeap fails to make all the disclosures required by TILA (see *supra*) and the MLA, 10 U.S.C. § 987(c) and 32 C.F.R. § 232.6, in its standard form loan agreements, in violation of the MLA.

128. GoodLeap's standard form loan agreements include mandatory arbitration provisions and class action waivers in violation of 10 U.S.C. § 987(e)(2), (3).

129. As a result, GoodLeap violates 10 U.S.C. § 987.

130. Plaintiffs are entitled to actual damages sustained as a result of Defendant's statutory breaches; appropriate punitive damages; appropriate equitable or declaratory relief; and any other relief provided by law.

---

[3] The MAPR includes all finance charges associated with the consumer credit, as well as fees and charges for services attendant to the extension of credit. 32 C.F.R. § 232.4(c).

131. Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

**COUNT THREE**
**(Fraud and Fraudulent Inducement)**
**(On Behalf of Plaintiffs and the MLA Class)**

132. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in paragraphs 1–105 above.

133. In the course of marketing, soliciting, originating, and servicing solar-financing loans, GoodLeap made material misrepresentations to Plaintiffs and the Class Members and intentionally concealed and omitted material facts concerning the true nature and cost of the financing transactions.

134. GoodLeap, directly and through its authorized agents, representatives, installers, and sales partners, represented to Plaintiffs and the Class Members that the loan principal reflected the true cost of the solar energy system and related installation services being financed.

135. The "Amount Financed" is among the most important and material terms of the loan agreements. GoodLeap's standard form loan agreements represented that the stated "Amount Financed" constituted "[t]he amount of credit provided to you or on your behalf" and that the identified sums would be paid to the solar installer for the purchase and installation of the solar energy system.

136. Specifically, Sgt. Dominguez's loan agreement stated that the "amount paid to others on your behalf" was "$27,352.30 to Titan Solar Power." That amount represented the full stated "Amount Financed" under the loan agreement.

137. Similarly, MSgt. Leja's loan agreement stated that the "amount paid to others on your behalf" was "$54,746.00 to Green Brilliance." That amount likewise represented the full stated "Amount Financed" under the loan agreement.

138. These representations were false and misleading.

139. The "Amount Financed" in Plaintiffs' and Class Members' loan agreements included a hidden and undisclosed dealer fee amounting to nearly 30% of the true cost of the solar energy system and related services. That hidden fee was not "paid to others" on behalf of Plaintiffs and the Class Members but instead was retained by GoodLeap as undisclosed profit.

140. Another highly material term of the loan agreements was the APR. GoodLeap and its sales partners placed significant emphasis on the purportedly "low APR" of 1.99% as a primary inducement for consumers to enter into the transactions.

141. However, a properly calculated APR must include both interest and finance charges associated with the extension of credit. Had GoodLeap properly included the hidden dealer fee in the APR calculation, the true APR would have been materially higher than the APR represented in the loan agreements and related financing disclosures.

142. The loan agreements further stated that interest would accrue only on amounts "actually disbursed." Despite this representation, GoodLeap accrued and collected interest on the entire stated "Amount Financed," including the undisclosed dealer fee amounts that were never actually disbursed for Plaintiffs' benefit or paid to the solar installers.

143. GoodLeap knew that the dealer fee existed, knew that it was embedded within the stated loan principal, and knew that it was not disclosed to Plaintiffs and the Class Members.

144. Upon information and belief, GoodLeap required or encouraged its solar installer partners and sales representatives to keep the existence and amount of the dealer fee confidential and not disclose the fee to consumers during the sales and financing process.

145. The misrepresentations and omissions alleged herein were standardized and made uniformly through GoodLeap's form loan agreements, financing disclosures, sales practices, and lending program.

146. Plaintiffs and the Class Members reasonably relied to their detriment upon GoodLeap's misrepresentations and intentional omissions of material information regarding the cost of the financing transactions, including the Amount Financed and the APR—the most material terms of the loan agreements.

147. Had Plaintiffs and the Class Members known the true facts—including the existence and amount of the hidden dealer fees, the inflated principal balances, the true APR, and that GoodLeap would charge interest on amounts not actually disbursed—they would not have entered into the transactions or would have done so only on materially different terms.

148. As a direct and proximate result of GoodLeap's fraudulent conduct, Plaintiffs and the Class Members suffered damages, including but not limited to inflated loan balances, undisclosed finance charges, excess interest payments, loss of money, and other economic damages according to proof.

149. GoodLeap's conduct was intentional, willful, malicious, oppressive, and carried out with conscious disregard for the rights of Plaintiffs and the Class Members, thereby entitling Plaintiffs and the Class Members to punitive damages to the fullest extent permitted by law.

150. Plaintiffs and the Class Members seek all available legal, equitable, declaratory, injunctive, compensatory, punitive, and other relief available under applicable law.

**COUNT FOUR**
**(Breach of Contract)**
**(On Behalf of Plaintiffs and the MLA Class)**

151. Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–105 above.

152. Plaintiffs and each Class Member entered into a written loan agreement with GoodLeap for the financing of a residential solar energy system. The loan agreements are standardized form contracts drafted by GoodLeap and contain materially identical terms and provisions applicable to Plaintiffs and the Class Members.

153. Under the terms of the loan agreements, GoodLeap represented and agreed, among other things, that: (a) the stated "Amount Financed" reflected amounts provided to or on behalf of the consumer for the purchase and installation of the solar energy system; (b) the itemization of the amount financed accurately identified the amounts paid to the installer on the consumer's behalf; and (c) "interest will accrue on the loan amounts actually disbursed."

154. GoodLeap materially breached the loan agreements by charging and collecting interest on amounts that were not "actually disbursed" for the benefit of Plaintiffs and the Class Members.

155. Specifically, GoodLeap retained for itself substantial undisclosed dealer fees embedded within the stated loan principal instead of disbursing those sums to the solar installers for the purchase and installation of goods and services for the consumers' benefit. Despite retaining those sums for itself, GoodLeap nevertheless charged and collected interest on those amounts over the life of the loans.

156. The contractual breaches alleged herein were uniform and standardized across GoodLeap's solar loan agreements and were committed pursuant to GoodLeap's common policies and practices.

157. As a direct and proximate result of GoodLeap's breaches of contract, Plaintiffs and the Class Members suffered damages, including but not limited to: (a) payment of interest on amounts never actually disbursed for their benefit; (b) payment of inflated principal balances; (c) overpayment of finance charges; and (d) other monetary damages according to proof.

158. Plaintiffs and the Class Members are entitled to recover all damages available under applicable law resulting from GoodLeap's breaches of contract, together with prejudgment interest, attorneys' fees where recoverable, costs, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Classes, Plaintiffs pray for judgment against GoodLeap as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiffs and their counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against GoodLeap and in favor of Plaintiffs and the Classes on all counts;

c. That the Court find and declare that Sgt. Dominguez's, MSgt. Leja's, and MLA Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that GoodLeap violated the MLA and award Sgt. Dominguez, MSgt. Leja, and MLA Class Members actual damages; appropriate punitive damages; appropriate equitable or declaratory relief; and any other relief provided by law;

e. An order declaring Defendant's credit agreements are void from their inception;

f. An order preventing Defendant from attempting to collect loan repayments from Plaintiffs and the Class members;

g. That the Court find and declare that GoodLeap violated TILA and award Sgt. Dominguez, MSgt. Leja, and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

h. That the Court enjoin GoodLeap from continuing to engage in predatory lending practices in violation of the MLA and TILA;

i. That GoodLeap be required by this Court's Order to compensate Plaintiffs' counsel for their attorneys' fees and costs of suit, and that GoodLeap be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

j. That the Court award interest as allowable by law and all costs of suit; and

k. That the Court award such other and further relief as the Court deems just and proper.

Respectfully submitted, Plaintiffs Kimberly Dominguez and Bradley Leja, by:

*/s/ Devon J. Munro*

Joshua R. Jacobson (*pro hac vice* forthcoming)
**JACOBSON PHILLIPS PLLC**
2277 Lee Rd, Suite B
Winter Park, FL 32789
(321) 447-6461
joshua@jacobsonphillips.com

Amy L. Judkins, Esq. (*pro hac vice* forthcoming)
**Normand, Judkins, & Couch, PLLC**
3165 McCrory Place, Suite 175
Orlando, FL 32803
T: (407) 603-6031
alj@normandpllc.com
evan.cassidy@normandpllc.com

Devon J. Munro (VSB # 47833)
**MUNRO BYRD, P.C.**
4235-A Colonial Ave.
Roanoke, VA 24018
(540) 283-9343
dmunro@trialsva.com